**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

ARNOLD DAVIS,

    Plaintiff,

    v.

WEXFORD HEALTH SOURCES, INC.,
DR. ASRESAHEGN GETACHEW,
DR. MAHBOOB ASHRAF,

    Defendants.

Civil Action No.: JKB-18-954

## MEMORANDUM OPINION

In response to this civil rights complaint raising claims of an Eighth Amendment violation, defendants Wexford Health Sources, Inc. ("Wexford"), Dr. Asresahegn Getachew, and Dr. Mahboob Ashraf,[1] filed a motion to dismiss or for summary judgment. ECF 18. The motion is opposed by plaintiff. ECF 21. Defendants have filed a reply (ECF 24), which plaintiff moves to strike. ECF 25.[2] No hearing is necessary to determine the matters now pending before the Court. *See* Local Rule 105.6 (D. Md. 2018). For the reasons that follow, defendants' motion, construed as one for summary judgment, shall be granted and plaintiff's pending motion denied.

## BACKGROUND

In his complaint, plaintiff Arnold Davis states that in 2013, Wexford approved surgery for his hand, but the surgery was unsuccessful and caused more nerve damage to plaintiff's hand. ECF No. 1, p. 4.

---

[1] The Clerk shall amend the docket to reflect the correct names of defendants.

[2] Plaintiff incorrectly characterizes defendants' reply as either an untimely motion to amend or as an impermissible surreply. ECF 25. Plaintiff is mistaken. As defendants did not file the complaint they are not seeking its amendment. Moreover, their reply is not a surreply but rather a permissible reply to plaintiff's opposition response. As such, the motion to strike will be denied.

In March of 2015, Dr. Jackson, a hand specialist, performed surgery on plaintiff's left hand to remove hardware. *Id.*, p. 3.

Plaintiff returned to Dr. Jackson on April 20, 2015, for a surgical wound check and evaluation of flexor tendon reconstruction of the left index finger. *Id.* During the consultation, plaintiff and Dr. Jackson discussed additional surgeries to repair the damaged tendon in plaintiff's left hand. *Id.* Dr. Jackson advised plaintiff that she would try to obtain the original note from the Eastern Shore Wicomico County Hospital, and if she could not do so, she would arrange for plaintiff to undergo "left hand exploration with possible placement of hunter rods, with possible tendon reconstruction with tendon graft." *Id.* Plaintiff states that the recommended treatment was urgent, particularly in light of the earlier failed surgeries, but Wexford failed to follow up regarding the consultation reports for two years and ten months, despite plaintiff's filing numerous sick call slips and complaints. *Id.*

Plaintiff states that he has been denied effective pain medication and has not been prescribed any pain medication since December of 2017. ECF 1, p. 4.

Plaintiff claims his hand is disabled and that he is unable to write with or otherwise use his hand. ECF 1, p. 4. He describes the pain as a muscle being constantly flexed with no release and periodically, throughout the day, the nerves are "jumpy," causing his fingers to move irregularly. *Id.* He also suffers from numbness and loss of circulation in his left hand. *Id.*

He indicates that Wexford is responsible for implementing and adhering to policies and protocols relating to health care services and the training of physicians, nurses, and other health care providers. ECF 1, p. 2. He claims that Wexford "chose to implement corporate policies by which the treatment of prisoners with serious medical conditions such as the plaintiff was delayed and denied." *Id.*, p. 5. He claims that those policies include denying plaintiff access to licensed

physicians, a hand specialist, physical therapy, pain medication, appropriate and necessary medical/surgical procedures, and treatment. *Id*.

Plaintiff alleges that Dr. Getachew is the Regional Director for Wexford and is responsible for "(a) assigning the appropriate health care providers to patients (b) insuring complaints are addressed appropriately." *Id*., p. 3. Plaintiff alleges that Dr. Getachew delayed and denied plaintiff access to adequate medical care for his serious injury, including access to licensed physicians, a hand specialist, pain medication, and appropriate and necessary procedures and treatments. *Id*, p. 5. Plaintiff states that Dr. Ashraf was responsible for providing medical care and treatment to plaintiff at North Branch Correctional Institution (NBCI). *Id*., pp. 2, 5. As relief, plaintiff seeks monetary damages.

Dr. Getachew avers that plaintiff's medical history is significant for chronic left hand pain secondary to a gunshot injury, allergic rhinitis, and asthma. ECF 18-5, ¶ 4.

The medical records reflect that on January 2, 2015, plaintiff was evaluated by Roy J. Carls, M.D. ECF 18-4, p. 2. Dr. Carls's recount of plaintiff's medical history indicates that plaintiff sustained a gunshot wound to his left hand in 2007. *Id*. Afterward, plaintiff underwent "several surgeries including a final reduction internal fixation of bone grafting to his left hand middle and ring finger metacarpals." *Id*. Plaintiff reported that he had some aching over the site with occasional numbness, especially at night. He also lost active flexion function of his index finger. *Id*. Examination demonstrated that plaintiff had full passive range of motion of all of his fingers, including his index finger. *Id*. He did not have active flexion of his index finger but did have active flexion of the other fingers and thumb. *Id*. Dr. Carls noted that the issues with plaintiff's left hand was due to "symptomatic hardware" and there were signs of possible carpal tunnel. *Id*. He noted that in his "opinion his primary functional deficiency is his active flexion loss with left

index finger." *Id*. Dr. Carls recommended plaintiff be evaluated by a hand surgeon to consider a staged procedure for tendon grafting and at the same time the hardware could be removed. *Id*. Dr. Carls stated, "[A]gain his primary deficiency is much more likely to help him reconstructively would be the index finger tendon and of course the hardware and even a carpal tunnel release could be done at the same time." *Id*.

On February 10, 2015, plaintiff was examined by Emme Jackson, M.D. ECF 18-4, p. 5. She recounted plaintiff's history of gunshot wound in 2007 with bone grafting to his 4th and 5th metacarpals in 2012. *Id*. In 2013, surgery was attempted to remove the plate in plaintiff's hand due to his report of pain, "however the surgeon did not have the correct screwdriver at the time and the surgery was aborted." *Id*. At the time of Dr. Jackson's exam, plaintiff continued to complain of pain at the plate site. "He also had a flexor tendon injury to the index finger which was planned to have a staged reconstruction, however this has never been done." *Id*. Examination demonstrated that while plaintiff did not have flexion of the index finger, he had full range of motion with passive flexion. *Id*. There was scar tissue in the palm, which was consistent with his complaint of numbness in the index and long finger and was likely due to digital nerve injury from the initial trauma. *Id*. The transverse carpal ligament compression test was negative, and plaintiff's thumb had normal sensation. Dr. Jackson indicated that she did not feel that plaintiff had carpal tunnel. *Id*. Rather, she assessed plaintiff as suffering from two issues: "[t]he inability to flex the index finger due to a tendon injury which would require a tendon reconstruction with an interposition tendon graft versus a hunter rod that is present in zone 2. He also has painful hardware on the dorsal aspect of his hand overlying the 4th and 5th metacarpals. The patient reports that the hardware troubles him the most and he would like it removed first." *Id*., p. 6. Plaintiff

was advised that he could have both procedures at the same time, but he indicated he wanted to proceed with the hardware removal first. *Id.*

On March 9, 2015, plaintiff underwent left hand surgery with Dr. Jackson at Western Maryland Regional Medical Center to remove the hardware. ECF 18-5, ¶ 5; ECF 18-4, p. 12. The hardware was removed successfully, and plaintiff was described as having tolerated the procedure very well. *Id.* Dr. Jackson noted that plaintiff should return for follow-up in two weeks. ECF 18-5, ¶ 6; ECF 18-4, p. 12.

After the surgery, plaintiff was seen by Renato Espina, M.D., during his 23-hour infirmary hold. ECF 18-5, ¶ 6; ECF 18-4, pp. 14-16. At that time, plaintiff complained of pain as 7 on a 10-point scale. *Id.* He was also seen by Delores Adams, R.N., who noted that plaintiff was able to perform all activities of daily living. ECF 18-5, ¶ 7; ECF 18-4, p. 17. During Nurse Adams's initial assessment of plaintiff, he stated that he did not need pain medication. ECF 18-4, p. 14. Later, plaintiff was found pounding on the door and yelling that he needed pain medication. ECF 18-5, ¶ 7; ECF 18-4, p. 17. He was offered a Toradol injection, but became loud and verbally abusive, accusing staff of racism. *Id.* He requested Percocet, but had an order for Toradol. *Id.* He also had orders for Ultram and Baclofen, but the medications had not been delivered from NBCI to WCI where plaintiff was then housed. ECF 18-4, p. 17. Plaintiff was advised that the staff would not enter as long has he continued yelling and pounding on the door. ECF 18-5, ¶ 7; ECF 18-4, p. 17. Two hours and 20 minutes later, plaintiff agreed to the Toradol injection and stated that it reduced his pain to 4 on a 10-point scale. *Id.*

The following day, plaintiff was evaluated by Dr. Colin Ottey. ECF 18-5, ¶ 8; ECF 18-4, p. 21-22. Plaintiff had limited range of motion in his fingers. No drainage was observed. He

reported his pain was controlled by medication and was discharged from the infirmary with a referral to see a provider in three days. *Id.*

On March 13, 2015, plaintiff was seen by Janette Clark, N.P. ECF 18-5, ¶ 9; ECF 18-4, pp. 23-24. At that time, the dressing was removed, and Clark noted that the wound had mild swelling, but the temperature was normal to the touch, there was no drainage, the steri-strips were intact, and there was no sign of infection. *Id.* Plaintiff was able to move all of his fingers and reported that his pain was controlled with Tramadol. Plaintiff was provided gauze and an ACE wrap. *Id.*

Plaintiff was evaluated by Colin Ottey, M.D., on March 25, 2015. ECF 18-4, p. 25. At that time, plaintiff had decreased range of motion in his left index finger and moderate pain with motion. *Id.* Dr. Ottey noted that plaintiff was still in need of the tendon repair and he would recommend surgical follow-up. *Id.* He submitted the consultation request for surgical follow-up on March 29, 2015. *Id.*, p. 27. The request was approved on April 2, 2015. *Id.*, p. 28.

Janette Clark, N.P., evaluated plaintiff again on March 30, 2015. ECF 18-5, ¶ 10; ECF 18-4, pp. 29-30. Plaintiff reported non-radiating intermittent pain in his left hand that was improving. He explained that the pain was aggravated by grasping and was relieved by ice and pain medication. He also reported that the pain had improved significantly with the hardware removed. *Id.*

Plaintiff returned to Dr. Jackson on April 20, 2015, for "follow-up for wound check evaluation and also possible evaluation for flexor tendon reconstruction to the left index finger." ECF 18-4, p. 36. The wound was healing appropriately, and plaintiff reported that the "plate pain was gone." *Id.* He requested tendon repair surgery. ECF 18-5, ¶ 11; ECF 18-4, p. 36. Dr. Jackson explained that plaintiff's records from Eastern Shore Wicomico Hospital needed to be obtained to

determine the extent of the injury to the tendon, and if the records could not be obtained there was the possibility for exploratory surgery and tendon graft. *Id.* Dr. Jackson's notes were reviewed with plaintiff on May 20, 2015. ECF 18-4, p. 37. NP Clark noted that Dr. Jackson requested the original surgical report from the hospital, but the referenced hospital appeared to be an inpatient mental health facility. Clark indicated she would ask plaintiff if he knew the hospital name and year of original treatment. She also noted that the report would determine whether plaintiff needed exploratory surgery or any surgery at all. *Id.*

On June 22, 2015, plaintiff was seen by Dr. Ashraf at the chronic care clinic. ECF 18-5, ¶ 12; ECF 18-4, p. 40. In light of plaintiff's report that he had no pain, his prescription for Tramadol was discontinued. His prescription for Baclofen, to treat muscular spasm, was continued. *Id.*

Plaintiff submitted numerous sick call slips through the end of June and July complaining of pain and inquiring as to his surgical consult. ECF 18-4, pp. 42-44. He was seen by NP Clark on July 30, 2015. *Id.*, p. 45. Based on plaintiff's history, she suspected that plaintiff's pain was neuropathic in origin and prescribed Gabapentin (also known as Neurontin). *Id.* She also indicated that she would refer him to the regional medical director for review of any plan for tendon repair. *Id.*

Plaintiff was seen by Dr. Ashraf in the chronic care clinic on September 9, 2015. ECF 18-5, ¶ 13; ECF 18-4, p. 48. Plaintiff continued to complain of pain in his left hand. Dr. Ashraf noted that plaintiff might benefit from reconstructive surgery with a tendon graft, and the prior recommendations for surgical repair had not been processed. ECF 18-4, p. 48. Dr. Ashraf submitted the consultation request that day. *Id.*, p. 51.

On September 24, 2015, plaintiff's case was discussed in collegial review and Dr. Getachew approved plastic surgery for elective tendon repair. ECF 18-5, ¶ 14; ECF 18-4, pp. 52-56. The surgery was approved on October 1, 2015. ECF 18-4, p. 56.

On December 4, 2015, plaintiff was seen by Krista Bilak, N.P., at the chronic care clinic. ECF 18-5, ¶ 15; ECF 18-4, pp. 58-60. At that time, plaintiff's chronic pain was deemed to be controlled and he was discontinued from the pain management chronic care clinic. *Id*. Nevertheless, his prescriptions for Baclofen and Gabapentin were continued.[3] ECF 18-4, p. 60.

Plaintiff had an x-ray of his left hand taken in December of 2015 which showed "status post open reduction internal fixation with stable hardware of the third metacarpal. There was an old impaction fracture at the base of the 4th metacarpal. There were scattered fragments on the left side." ECF 18-5, ¶ 16; *see also* ECF 18-4, p. 61.

Plaintiff was seen by NP Bilak on April 5, 2016, and the consultation for elective left-hand tendon repair was re-submitted. ECF 18-5, ¶ 17; ECF 18-4, pp. 62-63. The request was approved on April 15, 2016 (ECF 18-5, ¶ 18) but withdrawn on May 5, 2016, in favor of an alternative treatment plan of self-directed physical therapy. ECF 18-5, ¶ 19; ECF 18-4, p. 66.

In August of 2016, plaintiff was evaluated by Dr. Barrera. ECF 18-5, ¶ 20; ECF 18-4, pp. 72-75. Dr. Barrera noted that plaintiff had completed physical therapy; however, he reported that he still could not bend his finger. *Id*. Dr. Barrera recommended plaintiff be referred back to a surgeon and in September submitted a consultation request. ECF 18-5, ¶¶ 20-21; ECF 18-4, p. 77.

On April 28, 2017, plaintiff was seen by Dr. Ashraf. ECF 18-4, p. 82. Plaintiff's pain had increased, and Dr. Ashraf ordered Tramadol in addition to the Neurontin and Baclofen plaintiff was already receiving. He also noted that the director of collegial review was informed of

---

[3] Plaintiff indicates that he told Bilak that he did not want to be on medication for the rest of his life and plaintiff "suggested enduring the pain temporarily under the impression the surgery would be any day . . . ." ECF 21, p. 17.

plaintiff's condition and an email was sent as a reminder to schedule plaintiff with the hand surgeon. *Id.*

On May 23, 2017, plaintiff was evaluated by Ngozi Mogekwu, M.D., at University of Maryland Medical System (UMMS) orthopedics. ECF 18-5, ¶ 22; ECF 18-4, pp. 86-88. Plaintiff reported pain as ten on a ten-point scale. He was assessed as having an open wound with tendon injury. ECF 18-4, p. 88. X-rays taken that day showed "plate and screw fixation of healed gunshot fracture of the midshaft of the third metacarpal with slight residual cortical deformity. There is an old fracture of the shaft of the fourth metacarpal with residual medullary deformity. There are numerous tiny metallic fragments in the volar soft tissues of the hand." *Id.* p. 89. Dr. Mogekwu educated plaintiff on the risks of surgery, noted the time that had elapsed since the 2007 injury, and advised plaintiff that he may not have an appropriate pulley and the pulley may need reconstruction as well as a tendon graft. He was also advised that adhesions (scar tissue) could occur. *Id.*, p. 88. Dr. Mogekwu recommended an MRI to determine the location and presence of flexor tendons. *Id.*

On June 12, 2017, plaintiff was seen by Dr. Ashraf who noted that plaintiff had seen the surgeon and the surgeon recommended an MRI. ECF 18-4, p. 91. Dr. Ashraf advised plaintiff he would be seen again once the consultation was available and notified medical records.[4] *Id.*

---

[4] After not receiving the recommended MRI, plaintiff filed an administrative remedy procedure (ARP), which was found meritorious in part by the Commissioner who stated:

> Medical has failed to follow through and "fix" their specialty consult process, as indicated in the warden's response to your ARP. Specifically you were seen by a specialist at UMMS on 5/23/17, medical made no attempt to obtain the specialist's written notes from that visit until requested to do so as a result of this investigation. Medical is directed to have you seen by a provider within (7) days of the receipt of this response, review the UMMS Specialist's recommendations and report dated 5/23/17, and determine a treatment plan. If the provider determines that a written MRI consult is necessary, the consult shall be generated and presented to collegial. The collegial discussions shall be documented in the patient record and the outcome of collegial will be discussed with the patient.

ECF 21-1, p. 3.

Plaintiff's hand remained the same and he had active prescriptions for Neurontin, Tramadol and Baclofen for pain management. *Id.* On July 6, 2017, his pain medications were renewed or continued. *Id.*, p. 93.

Plaintiff was seen by Holly Pierce, N.P., on October 24, 2017. ECF 18-4, p. 95. She noted that Dr. Mogekwu had recommended an MRI of the hand and submitted a consultation request. *Id.*, pp. 95, 97.

On November 5, 2017, plaintiff was again seen by Pierce. ECF 18-4, p. 101. At that time, plaintiff requested prescriptions for Neurontin, Baclofen, and Tramadol. Pierce discussed alternative pain medications with plaintiff, but he insisted that only the three requested medications worked. Pierce renewed the prescriptions, but prescribed Neurontin on a tapering dose. *Id.*, pp. 101, 104. Plaintiff complained of increased pain due to the decrease in Neurontin and on December 6, 2017, Dr. Ashraf discussed with plaintiff his pain management plan. *Id.*, p. 110. Plaintiff declined Cymbalta and indicated he wanted to stay on Tramadol and Neurontin. Dr. Ashraf discussed plaintiff's case with Dr. Getachew who agreed on another tapering dose of both Neurontin and Tramadol. *Id.*, pp. 110, 112, 113.

On December 8, 2017, Dr. Ashraf entered an administrative note that plaintiff had already received Tramadol and Neurontin for the period prescribed and he directed that the orders for Tramadol and Neurontin be removed from the electronic health record. *Id.*, p. 114.

The MRI was approved on November 9, 2017, and conducted on December 13, 2017. ECF 18-4, pp. 105, 117. The MRI showed "1) significant thickening and heterogeneous signal in the fourth extensor tendon at the level of the fourth metacarpal consistent with high-grade partial or complete tear with significant scar formation; 2) magnetic susceptibility artifact along the third

and fourth metacarpals consistent with metallic hardware; 3) mild fifth extensor tendinosis; and 4) likely remote trauma to the ring finger distal phalanx." *Id*., pp. 117-18.

In February of 2018, plaintiff submitted a sick call slip asking that his prescriptions for Neurontin and Tramadol be renewed. ECF 18-4, p. 119. He was evaluated by Nurse Mast on February 4, 2018, who noted that plaintiff voiced no active complaints of pain despite his requesting pain medication renewal. *Id*., p. 120. Mast advised plaintiff to use warm compresses and to take Motrin for discomfort. He told her that Motrin did not help. *Id*. His prescription for Baclofen remained in place. *Id*.

In June of 2018, NP Pierce submitted a consultation request for plaintiff to be seen by UMMS orthopedics. ECF 18-4, p. 122. Due to security reasons, UMMS was no longer an approved off-site provider, and the consultation request was resubmitted for Union Memorial Hospital. ECF 18-5, ¶ 27; ECF 18-4, p. 126.

On July 2, 2018, plaintiff was evaluated by Pierce at chronic care clinic, where plaintiff complained of left-hand stiffness and discomfort. ECF 18-4, p. 123. He reported that the only ADLs he had difficulty with were handwriting and unidentified select physical exercise. He was employed and able to complete the duties of his employment. *Id*. He was able to dress, shower, eat, and complete hygiene tasks without difficulty. *Id*. Examination demonstrated that plaintiff's left index finger had limited active range of motion but full passive range of motion. *Id*., p. 124. No swelling, redness, or deformity were observed. It was recommended that he receive Ibuprofen for pain management, but he stated that he already had some. *Id*., p. 125.

On August 14, 2018, plaintiff was seen by Jimmy Daruwalla, M.D., a hand specialist at Union Memorial Hospital. ECF 18-4, pp. 127-30. Dr. Daruwalla noted that plaintiff is left hand dominate and complained that he was unable to make a fist with his left hand. *Id*., p. 128. Plaintiff

told Dr. Daruwalla that his ability to make a fist got worse after the hardware was removed from his hand and that initially he was able to make a fist. *Id*.

On examination, when asked to make a fist, plaintiff demonstrated minimal motion; however, plaintiff was described as inconsistently able to perform a passive place and active hold fist. ECF 18-4, p. 129. Additionally, plaintiff had no sensory deficit to light touch in any anatomic distribution. His fingers were described as well perfused and the scars well healed. *Id*. Dr. Daruwalla assessed the flexion deficit as intentional and noted there was no anatomical reason plaintiff could not make a fist. *Id*. Dr. Daruwalla noted that the fact that plaintiff had full passive range of motion suggested he was using his left hand and the "MRI further confirms no anatomic pathology with his flexor tendons." *Id*. It was determined that plaintiff was capable of using his hand and the flexor tendons were working; as such, the surgical procedure was not medically indicated. ECF 18-5, ¶ 29. Dr. Daruwalla recommended occupational therapy (ECF 18-4, p. 129), which medical providers indicate will be provided. ECF 18-5, ¶ 29.

In regard to plaintiff's analgesic medication, Dr. Getachew explains that Neurontin and Tramadol have been identified by DPSCS State Medical Director as medications with patterns of overuse and abuse within the DPSCS system, which includes the hoarding of medication due to the medicines' narcotic and sedative affects. ECF 24-1, ¶ 4. Accordingly, DPSCS has sought to eliminate the use of Neurontin for non-FDA-approved conditions, except in exceptional circumstances. *Id*., ¶ 5. Neurontin is FDA-approved as an anticonvulsant and to treat nerve pain caused by herpes virus or shingles and is not approved for plaintiff's conditions. *Id*. As such, his prescription was discontinued. *Id*.

In regard to Tramadol, generally the medication should not be prescribed for long-term use and is not indicated for long-term pain relief. ECF 24-1, ¶ 6. Tramadol is a synthetic opioid that

can be habit-forming and induce addiction abuse and misuse. *Id*. It may also cause respiratory complications. Additionally, synthetic opioids taken with alcohol can slow heart rate and lead to brain damage. Dr. Getachew avers that recent studies have shown that Tramadol works no better than placebos and is worse than other available narcotics. *Id*. As such, plaintiff's prescription for Tramadol was also discontinued. *Id*.

Dr. Getachew further explains that "the Center for Disease Control recommends non-pharmacologic therapy and non-opioid pharmacologic therapy as the preferred treatment for chronic pain." ECF 24-1, ¶ 7.

Plaintiff had been prescribed Baclofen for muscle spasms for approximately two years. ECF 24-1, ¶ 9. He had not been reporting continued spasms and given that Baclofen is generally not recommended for long-term administration, he was tapered off from Baclofen beginning in November of 2017. *Id*.

In regard to plaintiff's complaint of chronic pain, Dr. Getachew states that because a patient is assessed with chronic pain does not mean that they always have pain, as chronic pain may be continuing but more often is recurring. ECF 24-1, ¶ 10. Dr. Getachew further avers that plaintiff does not present with symptoms of severe pain. *Id*. "For example, when examined at the Union Memorial Hospital in August 2018, Plaintiff reported pain being 9/10 yet he exhibited no pain symptoms." *Id*. As a result, the orthopedist did not recommend any pain medication, only occupational therapy. *Id*. Dr. Getachew explains that plaintiff's long-term taking of Neurontin and Tramadol "tends to create dysfunctional pain perception in patients and could explain plaintiff's allegations that he is in constant severe pain." *Id*.

Additionally, plaintiff was offered Cymbalta as an alternative pain medication, but he declined the medication. ECF 24-1, ¶ 11. Currently, he is recommended to take over-the-counter

pain medication. *Id*. Dr. Getachew avers that in his opinion, Ibuprofen and Motrin are appropriate pain medications for plaintiff's reported left-hand pain. *Id*. All inmates are to purchase over-the-counter medication at the commissary unless they are indigent. *Id*. Plaintiff is not indigent. *Id*.

Dr. Getachew avers that the purpose of tendon repair surgery is not pain relief but "strictly for functional purposes for flexion of his left index finger." ECF 24-1, ¶ 12. Dr. Getachew explains that plaintiff suffered significant trauma to his left hand in 2007 when he sustained a gunshot wound. *Id*. As recounted above, hardware was installed in an effort to heal and maintain the function of the hand. *Id*. Chronic pain from such incidents is expected and not curable. *Id*. Rather, Dr. Getachew explains the goal is to make the pain manageable. *Id*. Dr. Getachew further avers that in his opinion, "it is extremely unlike[ly] that surgery to his left flexor tendons would in any manner reduce or cure Plaintiff's hand pain." *Id*.

Dr. Getachew avers that surgery is also not medically indicated for plaintiff's left index finger flexor tendons. ECF 24-1, ¶ 13. The 2017 MRI, which was reviewed by the hand surgeons at Union Memorial Hospital, indicated the flexor tendons were intact with no anatomic pathology. *Id*. Plaintiff did not show any symptoms of a pathology that would impair his left index finger flexor tendon function. *Id*. Dr. Getachew observes that "[s]urgery for surgery's sake is not medically indicated. There are always inherent risks with any surgery, including but not limited to motor function impairment, increased pain, and infection." *Id*.

As to plaintiff's contention that he was not taught appropriate physical therapy for his condition, Dr. Getachew explains that plaintiff underwent physical therapy in February and March of 2012. ECF 24-1, ¶ 14. Both Dr. Jackson and Dr. Barrera, in April 2015 and August 2016, respectively, noted plaintiff's continued therapy self-practice. *Id*. Based on the recommendation

of the Union Memorial hand specialists, a consult for additional therapy was placed in September 2018 and approved in December of 2018.  *Id*.

## APPLICABLE LEGAL STANDARDS

Defendants filed their Motion as a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment. Typically, when deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court considers only the complaint and any attached documents "integral to the complaint." *Sec'y of State for Defense v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007).  To the extent that grounds for dismissal are based solely on the contents of the complaint, the court may dismiss under Rule 12(b)(6) if the complaint does not allege enough facts to state a plausible claim for relief.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A claim is plausible when the facts pleaded allow "the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  Although courts should construe pleadings of self-represented litigants liberally, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), legal conclusions or conclusional statements do not suffice, *Iqbal*, 556 U.S. at 678.  The court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff.  *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cty.*, 407 F.3d 266, 268 (4th Cir. 2005).

Rule 12(d) requires courts to treat a Rule 12(b)(6) motion as a motion for summary judgment when matters outside the pleadings are considered and not excluded.  Fed. R. Civ. P. 12(d).  Before converting a motion to dismiss to one for summary judgment, courts must give the nonmoving party "a reasonable opportunity to present all the material that is pertinent to the motion." *Id.*  "Reasonable opportunity" has two requirements:  (1) the nonmoving party must have some indication that the court is treating the Rule 12(b)(6) motion as a motion for summary

judgment, and (2) the nonmoving party "must be afforded a reasonable opportunity for discovery" to obtain information essential to oppose the motion. *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985) (citation omitted). Here, the notice requirement has been satisfied by the title of the motion.

Within his opposition response, plaintiff seeks "additional time for discovery." ECF 21, p. 9. He indicates that "written discovery and depositions will further illuminate defendants['] responsibilities to provide 'adequate' medical care at NBCI, and to follow, and enforce policies and procedures promulgated by the State through the Department of Public Safety and Correctional Services relative to health care delivery." *Id.*, p. 10. He does not specify what discovery he seeks or how the material is necessary to his opposing the pending dispositive motion. The request will therefore be denied. Under these circumstances, the court will construe defendants' motion as a motion for summary judgment.

To show that a reasonable opportunity for discovery has not been afforded, the nonmoving party must file an affidavit or declaration under Rule 56(d) explaining why "for specified reasons, it cannot present facts essential to justify its opposition," Fed. R. Civ. P. 56(d), or otherwise put the district court on notice of the reasons why summary judgment is premature, *see Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244-45 (4th Cir. 2002).

Under Federal Rule of Civil Procedure 56, the court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The court may rely only on facts supported in the record, not simply assertions in the pleadings. *Bouchat v. Balt. Ravens Football Club, Inc.*,

346 F.3d 514, 522 (4th Cir. 2003). The nonmoving party has the burden to show a genuine dispute on a material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.* at 248-49.

## ANALYSIS

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *see also Hope v. Pelzer*, 536 U.S. 730, 737 (2002); *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)); *accord Anderson v. Kingsley*, 877 F.3d 539, 543 (4th Cir. 2017). In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants, or their failure to act, amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *see also Anderson*, 877 F.3d at 543.

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure it was available. *See Farmer v. Brennan*, 511 U.S. 825, 834-7 (1994); *see also Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 209-10 (4th Cir. 2017); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016); *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). Objectively, the medical condition at

issue must be serious. *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care); *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). "A 'serious medical need' is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Heyer*, 849 F.3d at 210 (quoting *Iko*, 535 F.3d at 241); *see also Scinto*, 841 F.3d at 228 (failure to provide diabetic inmate with insulin where physician acknowledged it was required is evidence of objectively serious medical need). Proof of an objectively serious medical condition, however, does not end the inquiry.

The subjective component requires "subjective recklessness" in the face of the serious medical condition. *See Farmer*, 511 U.S. at 839-40; *see also Anderson*, 877 F.3d at 544. Under this standard, "the prison official must have both 'subjectively recognized a substantial risk of harm' and 'subjectively recognized that his[/her] actions were inappropriate in light of that risk.'" *Anderson*, 877 F.3d at 545 (quoting *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004)); *see also Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997) ("True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk."). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference because 'prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844). The subjective knowledge requirement can be met through direct evidence of actual knowledge or through circumstantial evidence tending to establish such knowledge, including evidence "that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Scinto*, 841 F.3d at 226 (4th Cir. 2016) (quoting *Farmer*, 511 U.S. at 842). If the requisite subjective knowledge is established, an official may

avoid liability "if [he] responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844; *see also Cox v. Quinn*, 828 F.3d 227, 236 (4th Cir. 2016) ("[A] prison official's response to a known threat to inmate safety must be reasonable.").

A delay in medical treatment may amount to deliberate indifference. *Smith v. Smith*, 589 F.3d 736, 739 (4th Cir. 2009) (citing *Estelle*, 429 U.S. at 104-05). Deliberate indifference may be shown where a plaintiff demonstrates the delay in medical care caused him to suffer substantial harm. *See Webb v. Hamidullah*, 281 F. App'x 159, 166 (4th Cir. 2008). Substantial harm can be shown by "lifelong handicap, permanent loss, or considerable pain." *Shabazz v. Prison Health Servs. Inc.*, No. 3:10CV190, 2011 WL 3489661, at *6 (E.D. Va. 2011) (quoting *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001)).

Reasonableness of a medical provider's actions must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris*, 240 F.3d 383, 390 (4th Cir. 2001) (citing *Liebe v. Norton*, 157 F.3d 574, 578 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken)); *see also Jackson*, 775 F.3d at 179 (physician's act of prescribing treatment raises fair inference that he believed treatment was necessary and that failure to provide it would pose an excessive risk).

Nevertheless, mere disagreement over a medical judgment does not state an Eighth Amendment claim. *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977). Given that there is frequently more than one way to treat an injury or ailment, prison doctors are generally not required to follow the recommendation of other doctors. *See White v. Napoleon*, 897 F.2d 103, 109-10 (3d Cir. 1990). "If a plaintiff's disagreement with a doctor's professional judgment does not state a violation of the Eighth Amendment, then certainly no claim is stated when a doctor disagrees with the professional judgment of another doctor." *Id*. at 110; *see also Sanchez v. Vild*, 891 F.2d 240,

241 (9th Cir. 1989) ("A difference of opinion between medical personnel regarding treatment does not amount to deliberate indifference.")

Moreover, while "a prisoner does not enjoy a constitutional right to the treatment of his or her choice, the treatment a prison facility does provide must nevertheless be adequate to address the prisoner's serious medical need." *De'lonta*, 708 F.3d at 526 (transgender inmate stated plausible claim in alleging defendant's refusal to evaluate her for gender reassignment surgery where current therapy failed to alleviate urge for serious self-harm); *see also United States v. Clawson*, 650 F.3d 530, 538 (4th Cir. 2011) (right to treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical necessity and not simply that which may be considered merely desirable.").

The undisputed facts in the record demonstrate that there were numerous unexplained delays in providing plaintiff with follow-ups regarding consultation services. That delay, however, was not accompanied by a refusal to provide plaintiff with any palliative care, nor did the named defendants deliberately cause plaintiff to suffer needless discomfort. Rather, plaintiff was prescribed analgesic pain medication and had been instructed on self-directed physical therapy. While there is no explanation for the initial delay in the approval for surgical intervention and its resubmission, the second decision to delay the surgery is based on the objective observations of health care providers that a conservative course of treatment including physical therapy should first be tried. After a period of time, during which medical providers apparently believed plaintiff was engaged in self-directed physical therapy, he was again referred to the hand specialist who requested an MRI. He was then sent for follow-up evaluation by another hand specialist. Ultimately, that surgeon did not find surgical intervention was medically indicated based on both his physical examination of plaintiff and the objective results of the MRI.

"Deliberate indifference is a very high standard—a showing of mere negligence will not meet it . . . . [T]he Constitution is designed to deal with deprivations of rights, not errors in judgment, even though such errors may have unfortunate consequences." *Grayson v. Peed*, 195 F.3d 692, 695- 96 (4th Cir. 1999); *see also Jackson*, 775 F.3d at 178 (describing the applicable standard as an "exacting" one). The record in this case depicts the type of delays that one might expect in a large institutional setting with the now-familiar, cumbersome requirements for review and authorizations to obtain specialized care. This type of delay, however, does not support the subjective component required for a finding of an Eighth Amendment claim. *See, e.g.*, *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990), *overruled in part on other grounds by Farmer v. Brennan,* 511 U.S. 825, 837 (1994), *aff'd in pertinent part by Sharpe v. S.C. Dep't of Corr.,* 621 F. App'x 732 (4th Cir. 2015) (treatment rendered must be so grossly incompetent or inadequate as to shock the conscience or to be intolerable to fundamental fairness). Plaintiff has also failed to establish any injury as a result of the delay in his receipt of the MRI or follow-up with specialists. On the contrary, while the initial assessment was that surgery was indicated, additional diagnostic testing via the MRI showed that there was in fact no need for surgical intervention.

With regard to plaintiff's pain medication, the record evidence demonstrates that the discontinuation of plaintiff's Tramadol for approximately one month in June-July of 2015 was due to plaintiff's stating that he was not experiencing pain. The prescription for Tramadol was discontinued; however, plaintiff's Baclofen prescription remained in effect and he had access to over-the-counter analgesic medications. After complaining of increased pain, and in light of a medical provider's belief that the pain was neuropathic in origin, he was prescribed Gabapentin/Neurontin on July 30, 2015. The balance of the record shows that plaintiff regularly

received a variety of pain medications and that providers endeavored to work with plaintiff to effectively and safely manage his pain.

Certain medications were discontinued, not out of retaliation for plaintiff having filed grievances as he alleges, but due to system-wide DPSCS policy regarding the use of Neurontin and Tramadol, which were deemed to be medications susceptible to abuse. Plaintiff was tapered off of those medications and offered alternative prescription medications, which he declined. At all times relevant to the complaint, plaintiff had access to over-the-counter pain medication. In light of the foregoing, any disruption or discontinuation of plaintiff's pain medication did not amount to deliberate indifference to his serious medical need.

With regard to the policies plaintiff alleges may have played a part in the decisions shaping the course of his healthcare, defendants have provided legitimate medical reasons for those decisions, and there is no evidence they were motivated by a disregard for his well-being in favor of saving money. Plaintiff's bald assertion that Drs. Getachew and Ashraf caused a delay of almost three years in providing him with needed care is unsupported by the record.

By separate order, which follows, defendants' motion to dismiss or for summary judgment shall be granted and plaintiff's motion to strike shall be denied.

Dated this 3rd day of September, 2019 .

FOR THE COURT:

_____/s/_____

James K. Bredar
Chief Judge